This case was referred to the determination of the court, on facts stated by the counsel for both parties, which were, That the plaintiff's grandmother was a mulatto, begotten on a white woman by a negro man, after the year 1705, and bound by the churchwardens, under the law of that date, to serve to the age of thirty-one. That after the year 1723, but during her servitude, she was delivered of the plaintiff's mother, who, during her servitude, to wit, in 1742, was delivered of the plaintiff, and he again was sold by the person to whom his grandmother was bound, to the defendant, who now claims his service till he shall be thirty-one years of age. On behalf of the plaintiff it was insisted, 1st. that if he could be detained in servitude by his first master, he yet could not be aliened. But, 2nd. that he could not be detained in servitude.
I. It was observed that the purpose of the act was to punish and deter women from that confusion of species, which the legislature seems to have considered as an evil, and not to oppress their innocent offspring. That accordingly it had made cautious provision for the welfare of the child, by leaving it to the discretion of the churchwardens to choose out a proper master ; and by directing, that that master should provide for it sufficient food, clothing, and lodging, and should not give immoderate correction. For these purposes the master enters into covenants with the churchwardens; and to admit he had a power after this to sell his ward, would be to admit him a power of discharging himself of his covenants. Nor is this objection answered by saying that the covenants of the first master are transferred to the alienee, because he may be insolvent of tiro damages which should be recovered against him, and indeed they might be of such a nature as could not be atoned for, either to the servant or to society ; such, for instance, would be a corruption of morals either by the wicked precept or example of the master, or of his family. The truth is, the master is bound to the servant for food, raiment and protection, and is not at liberty, by aliening his charge, to put it out of his own power to aflbrd them when wanting. The servant may as well set up a right of withdrawing from his master those- personal services which he, in return, is bound to yield him. Again, the same trust which is created bj express compact in favor of the first mulatto, is extended In the law to her ksue. The legislature confiding that the choice of a in.wlei for the first mulatto, by the ditticliwardcns, would be ptudent, vest-the issue in him also without further act to be done : and the master, at the time he takes *91 die mother, knowing that her issue also is to be under his servitude on die same conditions, does by accepting her, tacitly undertake to comply with those conditions raised by the law in their favor. These servants bear greater resemblance to apprentices than to slaves. Thus, on the death of the first master, they go to his executor as an apprentice would, and not to his heir as a'slave. The master is chosen, in both cases, from an opinion of his peculiar propriety for that charge, and the performance of his duty in both cases is secured by mutual covenants. Now it is well known that an apprentice cannot be aliened; and that, not from any particular provision of the legislature, but from the general nature of the connection and engagements between them : there being, as was before observed, a trust reposed in the diligence and ‘ discretion of the master; and a trust by our law cannot be assigned. It adheres to the person as closely as does his integrity, and he can no more transfer the one than the other to a purchaser. But,
2nd. It was insisted, that the plaintiff, being a mulatto-of the third generation, could not be detained in servitude under any law whatever : the grand position now to be proved being that one law had reduced to servitude the first mulatto only, the immediate offspring of a white woman by a negro or mulatto man; r that a second law had extended it to the ‘ children’ of that mulatto ; but that no law had yet extended it to her grand children, or other issue more remote than tills. To prove this, a general statement of these laws was premised. Act of 1705, c. 49. s. IS, ‘ If any woman servant shall have a bastard child, by a negro or mulatto",or if a free Christian white woman shall have such bastard child by a negro or mulatto; in both the said eases the churchwardens shall bind the said child to be a servant until it shall be of thirty one years of age.’ In other parts of the act, it is declared who shall he slaves, and what a manumission of them ; from sect. 34. to 39. are regulations solely relative to slaves, among which is sect. 36. * Baptism of slaves doth not exempt them from bondage ; and all children shall be bond or free according to the condition of their rpothers and the particular directions of this act,’
Act 1723. c. 4. s. 22. i where any female mulatto, or Indian, by law obliged to serve till the age of thirty or thirty one years, shall, during the time of her servitude, have any child bom of Iter body, every such child shall serve the master or mistress of such mulatto or Indian, until it shall attain the same age, the mother of such child was obliged, by law, to serve unto.’
In 1748, the Assembly revising and digesting the whole body of our acts of Assembly, in act 14. s. 4, incorporate the-clauses before cited, without any addition or alteration. And in 1753, c. *92 .2. s. 4, .13, the law, of 1748, is re-enacted with some new matter which does not affect the present question.. .
Now it is plain the plaintiff does not come within the description of the act of 1705, s. 18; that only' reducing to servitude £ the child of a white woman by a negro or mulatto man.’ . This was the predicament of the plaintiff’s grandmother.’ I suppose it will not be pretended that the mother being a servant, the child would be a servant also Under the Jaw of nature, without any particular provisiop in the act. Under the law of nature, all men are born fre.e, every ope comes joto'the world with a right to his own person, which'includes the liberty of moving and using it at his own will. This is what is called personal liberty, and is given him by the author of nature, because necessary for his own sustenance. The reducing the’ mother to servitude was a violation of the law of nature: surely then the same law cannot prescribe a continuance of the violation, to her issue, and that too without end, for if it ex-, tends to any, it must to every degree of descendants. Puff. b. 6. fc. 3. s. 4. 9. supports 'this doctrine. For having proved that servitude to be rightful, must be founded on either compact, or capture in war, he proceeds to shew that the children of the latter only'follow the condition of the mother : for which he gives this reason, that the person and labor of the mother in a condition of perfect slavery, (as he supposes to be that of the captive in war) being the property of the master, it is impossible she should maintain it but with her master’s goods; by which he supposes a debt contracted from the infant to the master. But he says in cases of servitude founded on contract, ‘ The food of the future issue is dbntained or implied in'their own maintenance, which their master owes them as a just debt; and consequently their children are not involved in a necesssity of slavery.’ This is the nature of the servitude introduced by the act of 1705, the master deriving his title to the service of the mother, entirely from the contract entered into with the churchwardens. That the bondage of the mother does not under the law of nature, infer that of her issue, as included in her, is further obvious from this consideration, that by the same reason, the bondage of the father would infer that of his issue; for be may with equal, and some anatomists say with greater reason, be said to include all his posterity. But this very law admits there is no such descent of condition from father to child, when it imposes servitude on the child of a slave, which would have been unnecessary, if the condition had descended of course. Again, if it be a law of nature that the child shall follow the condition of the parent, it would introduce a very perplexing dilemma; as where the one parent is free and tire other a slave. Here the *93 child is to be a slave says this law by inheritance of tire father’s .bondage: but it is also' to be.free, says the. same law by inheritance of its mother’s freedom. This contradiction proves it to be no law of nature. ' . . •
But the 36th section of the aet-will perhaps, bé cited'as entailing the condition of the mother-on'-the child, where it says, that ‘children shall be bond,or free according to the condition,of the mother, and the .particular direction of this act.’ Now that the word ‘Bond’ in this clause relates to ‘ slaves’ only,,I am justified in asserting, not only from, common parlance, but also from its sense in other, parts of this v.ery act. And that on the other hand it considers those who were to be free after a temporary servitude, - as described under the word ‘ free.’ In this very section, 36, it says, ‘ baptism of slaves does not exempt them from bondage.’* Here then in the very sentence now under consideration, the word ’ bondage is used to-express perpetual slavery; and we cannot conceive they meant to use-ft in two different senses in the sqme sentence. So in clause nineteen of the same act, it says, ‘to preveht that abominable mixture of white men or women with negroes or mulattoes, whatever white man or woman being, free, shall inter-*marry with a negro or mulatto, be. shall be committed to prison,, &c.’ Now unless the act means to include, white servants, and * apprentices under the denomination of ‘ freemen/ theft-a white' servant or apprentice may intermarry with a negro- or "mulatto. But this is making the act miss of its purpose, which was ‘ to prevent the abominable mixture of white men or women with negroes* or mulattoes.’ But to put it out of dispute, the next clause (.twenty) says that ‘ if any minister shall, notwithstanding,.preéunie to marry a white man or woman with a negro or mulatto,’ he shall "incur such a penalty. Here then the prohibition is extended to.'whites in general, wrthout saying ‘free whites,’ as the former. clause did. But these two clauses are plainly co-extensiveapd consequently the word ‘ free’ in the nineteenth, was intended to include the temporary white servants taken in by the twentieth clause, under the general appellation of‘white men or women.’ So,that'this act where it speaks of bondmen, means those who are''‘ perpetual slaves,’ and where of ‘freemen,’ those who are to be free after a temporary servitude, as well as those who are so now. Indeed to suppose, where the act says, ‘the children,of a bondwoman shall be bond,’ that it means ‘ the children of a temporary servant shall be temporary servants,’ would infer tqo much: for it would make temporary servants of the children of white servant women, or of white apprentice women, which yet was never pretended. The conclusion I draw from this, is, that since the temporary *94 service of a white woman does not take from her the appellation of a freewoman, in the sense of this act, and her children under this, very clause are free, as being the children of a free woman, neither does the temporary servitude of a mulatto exclude her from the same appellation, and her children also shall be free under this clause, as the children of a free woman. So that the meaning of this clause is, that children shall be slaves, where slavery was the condition of the mother; and free, where freedom either immedi-diate or remote, was her condition: excepting only the' instance of the mulatto bastard, which this act- makes a servant, though the mother was free. This is the case alluded to by the last words of the clause, ‘ according to the particular direction of this act.’ Because in this case, the act had made a temporary servant of the child, though the mother was not so.
Then comes thg act of 1723, directing that where any female mulatto or Indian, by law obliged to serve till* thirty or thirty one, shall have a child during her servitude, such child shall serve the same master to the same age. This act does itself prove that the child was not obliged to serve under the former law of 1705, which had imposed servitude on the mother; and consequently that the clause ‘ children shall be bond or free, according to the condition of the mother,’ affected the children of slaves only. For wherefore else was this law made? If the children of a mulatto held in temporary servitude were to follow the condition of the mother, and be temporary servants under the law of 1705, that of 1723, was wholly unnecessary. But on the contrary, when we find an Assembly within eighteen years after the law of 1705, had been passed, the one half of whom would probably be the same members who had passed that law, when we see these people I say, enabling expressly that the children should be temporary servants,--it is a strong proof the makers of the first law had not intended they should be so. Expositio contemporánea est optima, is a maxim in our law, because such exposition is supposed to be taken from the makers of the law themselves, who best knew their own intention; and it is doubly exclusive, where the makers themselves passed a new act to testify their intention. So that I hold it certain, the act of 1705, did not extend to the children of the first mulatto, or that of 1723, would not have been made. :
That the act of 1723, did not extend to the plaintiff, is apparent *95 from its words; ‘Where any female mulatto bylaw obliged to serve till thirty one (that is, the plaintiff’s grandmother) shall du« ring the time of her servitude, have a child born of her body (that is, the plaintiff’s mother) such child shall serve till thirty one.’ This act describes the plaintiff’s mother then as the subject on which it meant to operate. The common sense of mankind would surely spare me the trouble of proving the word ‘ child’ does not include the grandchild, great-grandchild, great-great-grandchild, &c. in in-finitum. Or if that would not, the act itself precludes me, by declaring it means only a ‘child born of her body.’ So that as the law of 1705, has made a servant of the first mulatto, that of 1723, extends it to her children.
The act of 1748, is the next in course. At this time all our acts were revised and digested, and sent in one volume to receive his Majesty’s approbation. These two laws being found to be on the same subject, were then incorporated without any alteration. This however, could not affect their meaning, which is still to be sought after by considering the component acts in their separate state. At any rate it cannot affect the condition of the plaintiff, who was born in 1742, which was six years before it was made. The same may be said of the law of 1753, which'is copied from 1748, with only the addition of some new matter, foreign to the present question. So that on the laws of 1705, and 1733, alone, it is to be determined; with respect to which I have endeavored to shew;
That the first of them subjected to servitude, the first mulatto only.
That this did not, under the law of nature, affect the liberty of the children,
Because, under that law we are all born free. :
Because, the servitude of tire mother was founded on compact, which implies maintenance of her children, so as to have them under no obligation to the master. ■ -
And because, this descent of condition from parent to child, would introduce a contradiction where the one parent is free, and tire other in servitude.
That as little are they affected by the words of the act, ‘ children shall be bond or free, according to the condition of the mother.’ -
Because that act uses the word ‘ bond,’ so as to shew it means thereby those only who are perpetual slaves, and by the word. ‘ free,’ those who are entitled to freedom in preesenti or m futuro; and consequently calling the mother ‘ free,’ says her children shall be ‘ free.’
*96 . Because it would make servants of the . children of white servants or apprentices, which nobody will say is right.
And because the passing the act of 1723, to subject the child to servitude, shews it was not subject to that state under the old law.
And lastly, that the act of 1723, affects only £ children of such mulattoes,’ as when that law was made Were obliged to serve till thirty-one; which takes in the plaintiff’s mother who was of the second generation, but does not extend to himself who is of the third.
; So that the position at first laid down is now proven, that the act of 1705, makes servants of the first mulatto, that of 1723, extends it to her children, but that it remains for some future legislature, if any shall be found wicked enough, to extend it to the grand-children and other issue more remote, to the ‘ nati natorum et qui nascentur ah illis!’
Wythe, for the defendant, was about to answer, but the court interrupted him and gave judgment in favor of his client.

 This- refers to an act of Ass. 1C70, c. 12. which had enacted 4 that all servants not being Christians, imported into, this country by.shipping, shall be slaves for their life-time, but what shall come by land shall serve, if boys and girls, till thirty years of age, if men and women, twelve years and no longer.’